IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **SANTIAGO BERRIOS-BONES, ET AL.,** <br><br> Plaintiff, <br><br> vs. <br><br> **NEXIDIS, LLC, ET AL.,** <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:07CV193DAK |

      This matter is before the court on Defendants Walker Design Services, La Colonia, Rockwell Estates, James Walker, and Mitch Vice's ("Walker Defendants") Motion to Dismiss Plaintiff's Complaint, the Walker Defendants' Motion to Dismiss Jared Schneider and Jason Jensen's Cross-Claim, and the Walker Defendants' Motion to Dismiss Defendant Legacy Land Title's Cross-Claim. The court held a hearing on the motions on September 20, 2007. At the hearing, Plaintiff was represented by Justin Heideman, the Walker Defendants were represented by Blake Atkin and William Kimball, Defendants Jared Schneider and Jason Jensen were represented by Steven Loosle, and Defendant Legacy Land Title was represented by Gerry Holman. The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties. The court has further considered the arguments made by counsel at the hearing and the law and facts relevant to the motions. Now being fully advised, the court enters the following Memorandum Decision and Order.

## BACKGROUND

Because the court must accept all well pled facts as true at the motion to dismiss stage, the court takes the facts from Plaintiff's Complaint. Plaintiffs allege that Defendants have perpetrated an extensive investment and real estate fraud scheme. In fact, the Complaint in this case contains one hundred and fifty one pages of factual allegations.

Plaintiffs allege that Defendants represented themselves as providers of real estate investment education tools and real estate investment opportunities. Defendants sold Plaintiffs memberships in a "Buyer Partner Program" ("BPP"), which was represented as having been developed by an experienced private venture group and/or real estate developers. Defendants solicited Plaintiffs to invest by representing that they had developed an "exclusive proprietary process" and that Plaintiffs would have a rare opportunity to partner a multi-billion dollar investor group. Defendants repeatedly claimed that the opportunity was a "low-risk" way for the Plaintiffs to "significantly increase their net value."

From June 2004 through December 2004, Defendants solicited investments from Plaintiffs through Nexidis, LLC, to invest in the BPP whereby Plaintiffs were promised a low risk opportunity to use their good credit and financial stability to obtain a stable return through investment in real estate. Through telephone solicitation, email, and a "Welcoming Packet," the Defendants represented that by paying a membership fee, Plaintiffs would be presented with the opportunity to invest in real estate that had been pre-screened and pre-selected by an experienced joint-venture management group. Plaintiffs were further assured that the Plaintiffs need not do anything to advance the investment, but that the management group would arrange for everything, including securing the financing on all projects and ensuring that all debt payments

were made on the properties by setting up escrow accounts through which all payments would be made.  Plaintiffs were only required to pay an initial membership fee of at least $5000 and, in return, they were promised that they would receive a "commission fee" from each project they invested in that would be based upon the total loan obtained on the individual properties the Plaintiffs invested in.

Upon payment of the membership fee, Nexidis required most, if not all, of Plaintiffs to sign a General Agreement ("GA") with Global Financial Services ("GFS").  The GA set forth the terms of the investment.   Plaintiffs were told that they were required to sign the GA before they could receive priority to receive investment opportunities.

Plaintiffs allege that Defendants' representations made through the Welcoming Packet and other means were patently false and the BPP and the investments made through the Program were in fact high risk and had a high potential to negatively impact Plaintiffs' credit.  By personally signing on the loan documents for the properties presented through the investment scheme, Plaintiffs were taking on the sole responsibility for the re-payment of the loan terms without clear title or the ability to sell the property.

Plaintiffs further allege that the assurance that the investment was stable and low risk because Defendants would make one hundred percent of the loan payments from an escrow account was also false and without any real guarantee.  Plaintiffs assert that Defendants retained the real benefit from the loans and the investment by diverting funds from the loans for improper purposes through closely related companies and means while shifting the majority of the risk of the scheme to the Plaintiffs.

Beginning in early 2005, Plaintiffs were solicited to invest in the Rockwell Estates

Development in Draper, Utah and/or the La Colonia Development in Coachella, California. While the investment opportunity was initially presented and made through Nexidis, in May 2006 it was announced that Walker Design Services ("WDS"), the alleged developer of the projects, had taken over the projects. WDS later attempted to distance itself from Nexidis and represented that WDS had nothing to do with Nexidis. Plaintiffs allege that these representations were false because James Walker controlled both companies and both were simply alter egos of James Walker.

In addition, Plaintiffs claim that in order to entice them to invest in his projects, Defendant Walker made repeated representations to Plaintiffs that he had pledged his personal funds to ensure that loan payments would be made and provided personal financial statements to Plaintiffs to that effect.

For each project presented to the Plaintiffs by Nexidis and/or WDS, Plaintiffs were required to sign a Joint Venture Agreement ("JVG Agreement") or a General Partner Agreement ("GA"). Under these agreements, Defendants were granted equitable title to the properties and Plaintiffs agreed that Defendants would have sole discretion over the terms of the purchase, finance, and sale of the properties. Initially, GFS was identified as the company that would work with the developers of the projects and assign Plaintiffs to a qualifying project. However, by the time the Plaintiffs were presented with JVG Agreements on the Rockwell and La Colonia projects, these agreements were entered into between the Plaintiffs and Rockwell Estates, and La Colonia.

In both the Rockwell and La Colonia projects, loans were secured in the Plaintiffs' names to cover the purchase price of the lots. Defendants failed to disclose to Plaintiffs the fact that

WDS and/or related individuals and companies were the owners of the properties and that the purchase price of the properties Plaintiffs purchased were inflated, which resulted in a significant profit to WDS and/or other owners.  With the exception of only a few Plaintiffs, the Plaintiffs were not provided with fully executed closing documents and/or settlement statements for the property sales.  Furthermore, the Plaintiffs who invested in the Rockwell project were required to execute deeds transferring actual title back to Rockwell, another company managed and owned by James Walker.

In addition, construction loans were obtained on all of the lots in the Rockwell project and many of the lots in the La Colonia project, ostensibly for the construction or improvement of residences on the real property.  Plaintiffs were presented with and instructed to sign on all property closings, financing, and loan draw documents as presented by Defendants.  Defendants did not provide Plaintiffs with fully executed copies of the documents they were required to sign.  When presented with questions regarding the terms of the loans or the representations made in the loan documents, Defendants assured Plaintiffs that the banks were on board, implying that the banks had full knowledge and approved of the terms.  Plaintiffs allege that Walker and Mitchell Vice were improperly and illegally making draws from the construction loans on the Rockwell and La Colonia projects and using the funds for their own personal purposes.

The Defendants repeatedly made false representations regarding the status of the projects, including false representations that foundations had been poured and other false reports regarding the status of construction.  As Plaintiffs started to receive notices demanding payments on loans, they were informed by Defendants that Defendants were seeking refinancing and/or purchasers for the projects.  The promised refinancing never occurred, and the properties are now in default.

The banks have begun to take action directly against Plaintiffs for recovery of the loan amounts.

Based on these factual allegations, Plaintiffs assert causes of action for violations of Section 10(b) of the Securities Act and Rule 10b-5, violations of Section 12(1) of the Securities Act, Section 12(2) of the Securities Act, violations of Section 61-1-1 of the Utah Uniform Securities Act, violations of Section 61-1-22(1)(a) of the Utah Uniform Securities Act, fraudulent misrepresentation, breach of contract, breach of covenant of good faith and fair dealing, quiet title, waste, and negligence.

In their motion to dismiss, the Walker Defendants assert that Defendants Jared Schneider, Simon Juhlin, Jason Jensen, and Christopher Reyes were or are members or officers of Nexidis and were the parties who involved Plaintiffs in the real estate transactions that form the basis of this action. On November 18, 2005, Investifications LLC bought a list from Nexidis of the people who had been involved in real estate transactions with Nexidis. The Walker Defendants claim that the membership fees were not transferred to Investifications. Plaintiffs dispute these facts because they are not based on any allegations in the Complaint or any evidence in the record. Defendants did not submit affidavits or declarations to support these additional facts.

<u>**Walker Defendants' Motion to Dismiss Plaintiffs' Complaint**</u>

**A.  Claims under Securities Laws**

The Walker Defendants argue that the first five causes of action can only survive if Plaintiffs can prove the existence of a security. The first cause of action alleges a violation of Section 10(b) of the Securities Act and securities fraud under Rule 10b-5. 15 U.S.C. § 78j(b); 17 C.F.R. § 204.10b-5. The second cause of action alleges a violation of Section 12(1) of the Securities Act, requiring a registration statement in connection with the sale of a security. 15

U.S.C. § 771(a)(1).  The third cause of action alleges a violation of Section 12(2) of the Securities Act based on the offer or sale of a security "by means of a prospectus or oral communication" which contains misleading information or material omissions.  *Id.* § 771(a)(2).  The fourth cause of action alleges a violation of the Utah Uniform Securities Act, which forbids fraud "in connection with the offer, sale, or purchase of any security," Utah Code Ann. § 61-1-1.  The fifth cause of action alleges a violation of Utah Code Annotated Section 61-1-22(1)(a), which allows the complainant to sue, at law or equity, any person selling a security in violation of Section 61-1-7.  Section 61-1-7 makes it illegal to sale any unregistered security.

The Supreme Court has interpreted Congress' purpose "in enacting the securities laws . . . to regulate investments, in whatever form they are made and by whatever name they are called." *Reeves v. Ernst & Young*, 494 U.S. 56, 61 (1990).  There is purposefully a broad definition of security.  A security is defined to include "any note, stock, treasury stock, security future, bond, debenture . . . investment contract . . . [or any] instrument commonly known as a 'security.'" *S.E.C. v. Edwards*, 540 U.S. 389, 392 (2004).

Defendants argue that these real estate transactions are not "securities."  The Complaint calls the deals "investment contracts," but the Walker Defendants contend that the transactions in this case do not meet the *Howey* test used to determine if an investment is a security.  The three-pronged *Howey* test to determine if an investment is a security is: "whether the scheme involves (1) an investment of money in (2) a common enterprise with (3) profits to come solely from the efforts of others." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

The *Howey* test has been interpreted by the Supreme Court to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable

schemes devised by those who seek the use of money of others on the promise of profits." *Edwards*, 540 U.S. at 393. As the Court explained in *Edwards*, Congress' inclusion of "investment contract" in the statutory definition of "security" reflected the commonly held "blue sky" or state law definition, which defined an investment contract as "a contract or scheme for the placing of capital or lying out of money in a way intended to secure income or profit from its employment." *Id.* at 394.

However, the determination of whether Plaintiffs were sold investment contracts pursuant to the federal securities laws is a question of fact that is rarely appropriate for a motion to dismiss. What constitutes an "investment contract" is a question of fact, and not a question of law to be determined on a motion to dismiss. *Crowley v. Montgomery Ward & Co.*, 570 F.2d 875, 877 (10th Cir. 1975). The Tenth Circuit has denied several motions to dismiss security claims when "the plaintiffs reasonably allege the existence of investment intent and common enterprise and where nothing in the complaint precludes the finding of a security." *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1040 (10th Cir. 1980).

**(1) Investment of Money**

Under the first prong of the *Howey* test, Plaintiffs have alleged facts sufficient to show that they invested money in a security. In order to "invest money," investors must choose to give up specific consideration, meaning they gave up "some tangible and definable consideration in return for an interest that had substantially the characteristics of a security." *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 559-60 (1979). In this case, Plaintiffs paid thousands of dollars to participate in the BPP. The BPP was the method by which the Plaintiffs entered into the investment, and the JVG Agreements with Defendants were the vehicle by which

the scheme was carried out and by which the investments were made in particular properties or projects. Furthermore, the loan proceeds, which the Plaintiffs are bound to repay also constitute consideration for the JVG Agreements. Defendants make no argument that Plaintiffs have not met this prong of the *Howey* test. Thus, this element is satisfied.

**(2) Common Enterprise**

Under the second prong, Plaintiffs contend that they have pled sufficient facts to show a common enterprise. If a "transaction is in reality an investment . . . then it creates a common enterprise and gives rise to a security falling within the ambit of the 1933 and 1934 Securities Acts." *McGill v. American Land & Exploration Co.*, 776 F.2d 923, 925 (10th Cir. 1985). To determine whether or not a common enterprise exists, courts have examined the "economic reality of the transaction involved." *Bradford*, 670 F. Supp. at 931. The determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit. If it was, the economic reality requirement is often fulfilled and there is strong indicia that the investment is a security. *Id.*

Plaintiffs in this case argue that they did not invest in a program or in joint venture agreements that were purely commercial in nature; instead, the BPP and JVG Agreements were entered into with the expectation of profit and not just a return based on capital appreciation. Thus, the economic reality of Plaintiffs' investments gives rise to a "common enterprise" within the meaning of the *Howey* test.

Defendants contend that the Rockwell Estate Transaction between Plaintiffs and Walker Design did not involve a security because Plaintiffs did not invest in a common enterprise with Walker Design, but with Nexidis. Defendants claim that although Walker Design was the

9

developer of the Rockwell Estates, Walker Design has no involvement in the purported securities scheme relating to Rockwell Estates. No agreement was signed between Walker Design and Plaintiffs and no membership fees were paid to Walker Design. Plaintiffs paid membership fees directly to Nexidis.

Although the Walker Defendants argue that no common enterprise exists because Plaintiffs' first contact was through Nexidis and Nexidis received the payment from Plaintiffs, Plaintiffs assert that the Defendant with which the initial contact was made is irrelevant for determining the existence of a common enterprise or for the determination of whether the investment constitutes a security. In order to be held jointly and severally liable, the law only requires proof of a primary violation of securities law and the Defendants' knowledge of the primary violation of securities law as well as substantial assistance by Defendants in achieving the primary securities violation. *DBLKM Inc. v. Resolution Trust Corp.*, 969 F.2d 905, 908 (10th Cir. 1992).

In addition, Plaintiffs allege that they were introduced to Walker Design by Nexidis and were represented as a certified partner of Nexidis. Walker Design was also represented to Plaintiffs by Walker Design employees as the parent company of Nexidis. After Walker Design took complete control of the BPP, Walker Design and its employees almost exclusively communicated with Plaintiffs to detail the ongoing relationship, carried out the investment scheme in substantially the same manner as Nexidis, and expressly reiterated and ratified the representations and promises originally made by Nexidis. Thus, the Complaint alleges that the Walker Defendants knew and participated with Nexidis in the carrying out of the BPP and were an essential part of the Nexidis enterprise, subsequently exercising control over the enterprise.

Even if this court were to determine that the relationship between Nexidis and the Walker Defendants is relevant to the inquiry of common enterprise, the court concludes that Defendants are not entitled to dismissal of this claim as a matter of law because there are disputed facts as to the relationship and level of substantial assistance between the Walker Defendants and Nexidis.

**(3) Profits**

Under the third prong of the *Howey* test, buyers must invest money in a common venture with a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Housing Foundation v. Forman*, 421 U.S. 837, 852 (1975). The Supreme Court has defined profits to be "either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds." *Id.* Payment of interest does not constitute "profit," even with its attendant consequence of tax deductibility. *Forman* at 852.

The Walker Defendants contend that the transaction fails the third prong of the *Howey* analysis because the Plaintiffs were paid 1% interest on their loan, regardless of the success or failure of the enterprise. The 1% was paid in the beginning, with no waiting to determine whether or not the project would be successful.

The *Edwards* Court explained that the *Forman* case supports the "commonsense understanding that profits in the *Howey* test as simply financial returns on investments." *Edwards*, 540 U.S. at 394. The term "profits," thus, refers to "the profits that investors seek on their investment, not the profits of the scheme in which they invest." *Id.* The *Edwards* Court determined that there was no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of determining "profits" under the *Howey* test. *Id.* The

Court held that an investment scheme that promised a fixed return rate can be an investment contract and, thus, a security. *Id.* at 397.

Plaintiffs expected to receive profits from the approximately $5,000 they each invested in the Nexidis BPP. Furthermore, Plaintiffs' investment allowed them to participate in the BPP, for which they would receive a "commission fee" every time their credit history was used to secure a real property loan. This commission fee constitutes the profit that Plaintiffs expected. As in *Edwards*, the return that Plaintiffs received constitutes a profit within the meaning of the *Howey* test, and the scheme constitutes an investment scheme.

Furthermore, Plaintiffs' Complaint alleges that the commission fees came solely from the entrepreneurial efforts of the Walker Defendants. In order for an investment contract to exist, profits must come from the "entrepreneurial or managerial efforts of others." *Edwards*, 540 U.S. at 394. This court has recognized that because the Tenth Circuit has adopted an economic reality test to determine whether or not individuals had an expectation of profit, the entire transaction should be examined flexibly. *Bradford*, 670 F. Supp. at 931.

The Walker Defendants focus primarily on the argument that Plaintiffs' legal title of the properties in La Colonia gave them control over the investment and that legal title is enough to eliminate any entrepreneurial or managerial efforts by Defendants. Plaintiffs, however, depended entirely on Walker and Vice for access to critical information about the ventures. Plaintiffs also lacked any power under the JVG Agreements to decide even the most basic decisions regarding the property, including the terms of the loan agreements they signed off on. Under the JVG Agreements, Plaintiffs had bare legal title to the property but Defendants reserved equitable title.

Furthermore, in regard to the Rockwell Estate properties, the Plaintiffs do not have legal title to the property. Under the terms of the JVG Agreements, Rockwell and La Colonia "reserved an unrestricted right to cause the transfer of the legal title of the properties held by Plaintiffs." The JVG Agreements further restricted Plaintiffs' ability to contact any prospective seller, agent, or representative without express consent by Defendants. Plaintiffs were required to grant Defendants the power to determine who would have possession of the property, negotiate leases, determine rents, etc.

The facts alleged in the Complaint indicate that the Plaintiffs made no decisions regarding the development of the property and were not in any way actively involved in the decisions regarding the development of the properties. The Walker Defendants made all of the decisions regarding the price and negotiation of the purchase price for the undeveloped lots, the terms of financing, the companies used to broker the loans, the design and construction schedule for the development of the lots, the draws made on the construction loans, and in fact made payments on the loans. The Defendants had control over the ultimate expectation of profits.

Plaintiffs have adequately alleged that the profits of the investment were from the managerial efforts of others. Because Plaintiffs have established all three elements under the *Howey* test, the court concludes that the Nexidis BPP and the JVG Agreement are securities as defined in federal securities laws.

Furthermore, Defendants argue that the projects in Utah and California did not involve securities because they were typical real estate transactions and real estate deals are not securities because of land's inherent value. Real estate transactions are typically deemed outside the bounds of the Securities and Exchange Acts. "A piece of real estate, such as a condominium, has

an inherent worth, a worth not solely dependent on the efforts of a promoter. For this reason, real estate transactions are not in and of themselves governed by the federal securities laws." *Bender v. Continental Towers Ltd. Partnership*, 632 F. Supp. 497, 501 (S.D.N.Y. 1986). If a buyer is not motivated solely by profits, but by a desire to develop the land himself, then securities laws are inapplicable. *Forman*, 421 U.S. at 852-53. Also, importantly, "investments in land solely for the purpose of profits from appreciation on resale cannot be securities." *Gordon v. Terry*, 684 F.2d 736 n.4 (11th Cir. 1982). The Tenth Circuit has declared that a "land purchase contract, simply because the purchaser expects or hopes that the value of the land purchased will increase," does not convert the transaction automatically into a security under the federal securities acts. *McCown v. Heidler*, 527 F.2d 204, 208 (10th Cir. 1975).

But courts have consistently held that investments in real property can fall under the federal securities laws. *See Howey*, 328 U.S. at 293. *Howey* involved the sale of tracts of citrus grove acreage. The *Howey* Court held that the land sales contracts, warranty deeds, and service contracts were investment contracts even when the "tangible interest had an intrinsic value independent of the success of the enterprise as a whole." *Id.* at 300-01. Like *Howey*, Plaintiffs in this case, invested in the BPP and JVG Agreements with the intention to obtain profits from their investments.

Therefore, the court concludes that there is a question of fact with respect to whether investment scheme in this case is a security. As a result it is premature to resolve the issue at the motion to dismiss stage. Accordingly, the Walker Defendants' motion to dismiss is denied.

**B. State Law Claims**

The Walker Defendants further contend that each of Plaintiff's state law claims should be

dismissed. First, the Walker Defendants argue that the fraudulent misrepresentation claim has not been pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure, and should be dismissed. Plaintiffs assert that their fraud allegations meet the specificity requirements of Rule 9(b).

Plaintiffs' Complaint identifies particular defendants with whom they dealt directly, designates the occasions on which affirmative statements were allegedly made to them and by whom, and designates what alleged misstatements were directed to them. The court concludes that the Walker Defendants have adequate notice of the claims against them. Therefore, there is no basis for dismissing the fraudulent misrepresentation claim under Rule 9(b).

Next, the Walker Defendants argue that the breach of contract claim must be dismissed with respect to Defendants James Walker and Mitch Vice because they are not in privity of contract with the Plaintiffs. The Walker Defendants also claim that a quiet title action could only be applicable to Rockwell Estates and should be dismissed against all other defendants. Finally, Defendants assert that Walker Design cannot be liable for waste on Plaintiffs' property because it was not legally in possession of the property. *Oquirrh Assocs. v. First Nat'l Leasing Co.*, 888 P.2d 659, 664 (Utah Ct. App. 1994).

On the breach of contract claim, Plaintiffs argue that there are disputed material facts as to secondary liability. Plaintiffs allege that La Colonia and Rockwell are the alter egos of Walker and Vice. Also based on their assertions of alter ego, Plaintiffs argue that the quiet title and waste claims should not be dismissed against any of the individual Defendants.

Alter ego is a highly fact intensive issue and inappropriate to resolve at the motion to dismiss stage. Even if it is not specifically pled in the Complaint as a cause of action, the facts

allege such an assertion. Accordingly, the court denies the Walker Defendants' motion. The complexities of the relationships between the parties preclude a determination as a matter of law with respect to which parties should remain in the case for given claims. These issues can be resolved through discovery.

### Walker Defendants' Motion to Dismiss Schneider and Jensen's Cross-Claim

The Walker Defendants seek to dismiss the cross-claim asserted against them by Defendants Schneider and Jensen. The cross-claim includes four claims for relief alleging that Walker and/or Walker Design agreed to pay Schneider and Jensen $1.5 million in return for ownership of Nexidis and Walker and/or Walker Design has breached the purchase agreement. The claims allege breach of contract, contractual indemnity, implied indemnity and contribution, and statutory liability pursuant to Utah Code Annotated Section 48-2c-602 and alter ego.

The cross-claim alleges that Walker and/or Walker Design held themselves out as doing business through a Utah company known as Investifications. However, neither Walker nor Walker Design ever actually organized Investifications as a proper legal entity under the laws of the State of Utah. In reality, Investifications is merely a dba or the alter ego of Walker and/or Walker Design.

Using the name Investification, Walker and/or Walker Design entered into a Membership Interest Purchase and Sale Agreement with Schneider and Jensen. Pursuant to the Agreement, Walker and/or Walker Design purchased 100% of the membership interests of a limited liability company known as Nexidis from Schneider and Jensen. Walker and/or Walker Design took control of the operations in early 2005.

The Walker Defendants argue that Schneider and Jensen have not pled that they complied

with or performed their duties under the terms of the contract as required to establish a prima facie case of breach of contract. But the allegations in the cross-claim sufficiently infer that Schneider and Jensen performed their contractual obligations. On a motion to dismiss, the allegations must be construed in favor of Schneider and Jensen, and all reasonable inference must be drawn in their favor. The obligation of Schneider and Jensen under the Agreement was simply to transfer control of Nexidis to the Walker Defendants. The cross-claim states that they performed this obligation.

In addition, the Walker Defendants argue that Walker Design was not in privity of contract with Schneider and Jensen. The basis for each of the claims is the Membership Interest Purchase and Sale Agreement. Walker Design is not a party to the Agreement. The cross-claim, however, alleges that the Walker Defendants are liable for all contractual obligations of Investifications based upon the alter ego doctrine and because they failed to organize Investifications as required by Utah law. Under the Utah Revised Limited Liability Company Act, a limited liability company is formed by the signing and filing of articles of organization with the State of Utah. Utah Code Ann. § 48-2c-401. The Act further states that "all persons who assume to act as a company without complying with this chapter are jointly and severally liable for all debts and liabilities so incurred." Utah Code Ann. § 48-2c-602(1).

Moreover, the claim for implied indemnity and contribution does not require privity of contract. Implied indemnity and contribution are equitable doctrines that apply whenever a person is required to discharge in whole or in part a duty that should be discharged by another.

Therefore, the court denies the Walker Defendants' motion. The cross claim adequately alleges that Schneider and Jensen conveyed Nexidis to Investification, and thus performed under

the contract. Also, the alter ego assertions create a question of fact as to whether the parties were in privity of contract, and privity is not necessary for the equitable claims.

### Walker Defendants' Motion to Dismiss Legacy Land Title's Cross-Claim

Plaintiffs' Complaint alleges that Legacy Land Title negligently deeded Plaintiffs' properties to Gilger and missed obvious encumbrances on Plaintiffs' properties. Legacy disputes these allegations. Legacy asserts a cross-claim against all defendants in the case. The Walker Defendants assert that Legacy has not entered into any contracts with the Walker Defendants.

Walker Design argues that it cannot answer responsively to Legacy's cross-claim because it does not give enough facts and information to state a legal claim. Rule 9 states that a party that is seeking to allocate fault under Title 78 Chapter 27 of the Utah Code must file "a description of the factual and legal basis on which fault can be allocated. Utah R. Civ. P. 9(I)(1)(A). The Walker Defendants contend that the only thing that can be gathered from the cross-claim is that in some way all of the Defendants are or may be liable to Legacy for all or part of the claims and/or damages asserted by Plaintiffs.

Legacy relies on the Plaintiffs' Complaint to supply the facts and circumstances of Walker Design's liability toward Legacy. Legacy incorporates by reference the allegations against the other co-defendants as part of its cross-claim. Legacy excludes itself from cross-claim allegations by stating that "the facts and circumstances supporting this cross-claim arise out of incidents, occurrences, and actions that are the subject of the Plaintiffs' Complaint, as pled therein, which, with the exception of any and all claims of negligence or liability against Legacy, are specifically incorporated herein by this reference." Thus, the 1,000 paragraphs of the Complaint, minus the limited allegations against Legacy, are incorporated into Legacy's Cross-

Claim.  The content of those paragraphs are sufficient at this stage of the litigation to sustain a cross-claim in this case.

The purpose for Legacy's cross-claim is merely to preserve an apportionment of fault defense against other co-defendants.  In order to preserve such apportionment of fault against other co-defendants, a cross-claim is required.  This requirement is explained in *National Service Industries Inc. v. B.W. Norton Manufacturing Co.*, 937 P.2d 551 (Utah Ct. App. 1997).  In *National Service*, the court explained that "to preserve the right to litigate [supplier's] liability, [seller] must have filed a cross-claim against [supplier] during the underlying tort action against the [plaintiff].  In reaching our conclusion, we recognize that prohibiting subsequent apportionment suits essentially requires joint tortfeasors co-defendants to raise cross-claims against each other in the underlying tort action or else such claims may be lost.  As such, cross-claims for apportionment among joint tortfeasor co-defendants are mandatory." *Id.* at 556.

Legacy's cross-claim is merely a procedural necessity required to preserve all defenses of apportionment of fault against other co-defendants in this case.  Like the parties in *National Service*, if the Walker Defendants are successful in being dismissed from this case, Legacy is required to have filed a cross-claim in order to attempt to apportion any appropriate fault to the Walker Defendants in subsequent litigation of this case.  Accordingly, the cross-claim is not improper, inappropriate, or premature.

The court denies the Walker Defendants' motion.  All that Legacy needs to demonstrate is that the other defendants may be at fault as well.  The allegations of the complaint demonstrate a factual basis for that allegation.  Accordingly, Legacy's claim is properly asserted against the Walker Defendants.

## CONCLUSION

Based on the above reasoning, the Walker Defendants' Motion to Dismiss Plaintiff's Complaint is DENIED, the Walker Defendants' Motion to Dismiss Jared Schneider and Jason Jensen's Cross-Claim is DENIED, and the Walker Defendants' Motion to Dismiss Defendant Legacy Land Title's Cross-Claim is DENIED

DATED this 30th day of October, 2007.

BY THE COURT

DALE A. KIMBALL
United States District Judge